**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
**In The Court of Appeals**

Jane and John Doe, Respondents,

v.

Nikki Gardner, Jeremy Gardner, and SCDSS, Defendants,

Of whom Nikki Gardner is the Appellant

and

Jeremy Gardner and SCDSS are Respondents.

In the interest of a minor under the age of eighteen.

Appellate Case No. 2020-000168

———————

Appeal From Pickens County
Karen S. Roper, Family Court Judge

———————

Unpublished Opinion No. 2021-UP-193
Heard May 4, 2021 – Filed June 2, 2021

———————

**REVERSED AND REMANDED**

———————

Kimberly Yancey Brooks, of Kimberly Y. Brooks, Attorney at Law, of Greenville, for Appellant.

Vanessa Hartman Kormylo, of Vanessa Hartman Kormylo, P.A., of Greenville, for Respondents Jane and John Doe.

Allyson Sue Rucker, of The Rucker Law Firm, LLC, of Greenville, for Respondent Jeremy Gardner.

Julie Mahon Rau, of South Carolina Department of Social Services, of Pickens, for Respondent South Carolina Department of Social Services.

Karen G. Pruitt, of Karen G. Pruitt, Attorney at Law, of Pickens, as Guardian ad Litem.

_____

**PER CURIAM:**  Nikki Gardner (Mother) appeals an order terminating her parental rights to Child.  On appeal, Mother argues the family court erred in terminating her parental rights based on (1) a diagnosable condition unlikely to change within a reasonable time and (2) severe or repetitious harm that made it unlikely her home could be made safe within twelve months.  We reverse and remand.

Mother and her husband Jeremy Gardner (Father; collectively, Parents) have a history of drug addiction and involvement with the Department of Social Services (DSS).  In March of 2014, the family court removed Mother's oldest two children from Parents after Mother tested positive for opiates when she was thirty-four weeks pregnant.  These oldest two children were placed in the custody of alternate caregivers, where they remain.

In August of 2014, Mother gave birth to a child (Sibling 1) who tested positive for methamphetamine.  Sibling 1 was removed from Parents, and Parents were ordered to complete placement plans.  Parents did not complete their placement plans.  In 2016, the family court terminated Parents' parental rights to Sibling 1, and the Does adopted her.

In 2016, Mother gave birth to another child (Sibling 2), who suffered withdrawal symptoms from drugs at birth.  The family court removed Sibling 2 from Parents and relieved DSS of providing reunification services.  The court later terminated Parents' parental rights to Sibling 2, and the Does adopted him.

In October 2018, Child was removed from Parents at birth after suffering "withdrawal symptoms from being exposed to Subutex while in utero."[1] DSS placed Child with the Does in November 2018, and the Does filed this private action for termination of parental rights (TPR) and adoption on November 29, 2018.

On December 12, 2018, the family court held a merits removal hearing for Child's case. In its February 5, 2019 order, the family court ordered Parents to complete a placement plan that included submitting to drug abuse assessments and following recommendations, maintaining stable and suitable housing, completing parenting classes, submitting to mental health assessments and following recommendations, and participating in couples counseling.

On July 10, 2019, the family court held a permanency planning hearing. In its September 5, 2019 order, the family court found Mother was participating in "a medication assisted treatment program at Behavioral Health Services" (BHS) and would "likely be in this program long-term until she . . . tapered off that medication completely." The court also found Mother "completed all requirements [from the drug assessment] beyond the medication assisted treatment and associated counseling." The court found Father was "engaged in [an] Intensive Outpatient Program" and would complete the program in a couple of weeks. Finally, the court found Parents completed parenting classes and mental health assessments, which determined they did not need further services. At the time of the July 2019 permanency planning hearing, DSS recommended reunification. However, before the permanency planning order was filed, Child tested positive for methamphetamine after an unsupervised visit with Parents.

On October 7 and 8 and December 19, 2019, the family court held this TPR hearing. Mother acknowledged her lengthy history with DSS but asserted she and Father completed their placement plans in Child's case and Child could safely return to their home. She maintained she last used heroin and oxycodone prior to learning she was pregnant with Child, she last used methamphetamine in July 2018, and she had not tested positive for drugs since beginning BHS in January 2019. Mother acknowledged BHS prescribed her Suboxone[2] to manage her opiate addiction but asserted she planned to wean off of it. She claimed Suboxone was not mind altering and she did not "feel any different" on it. Mother testified she used Suboxone to control cravings, and it offered mild pain relief for her scoliosis.

---

[1] Subutex is a prescription medicine that treats opiate withdrawal symptoms.

[2] Suboxone is a prescription medicine used to treat opiate addiction.

Other testimony at the TPR hearing echoed Mother's testimony that she and Father successfully completed their placement plans, including drug treatment. Madison McNeely, a DSS caseworker, testified Mother completed her placement plan in Child's case and demonstrated she could "provide support for [Child] as well as maintain her sobriety for the duration of this case." McNeely stated Father also completed his placement plan, made behavioral changes, and maintained sobriety. She testified Parents did everything DSS asked of them, and DSS believed reunification would be safe for Child.

Michael Crouch, a BHS peer support and substance abuse specialist, testified Mother was placed in his group in January or February 2019. He stated Mother's assessment indicated "she didn't meet [the Association of Addiction Science Medicine's] criteria to have treatment," but ongoing counseling was recommended because she was prescribed Suboxone. Crouch stated Mother attended group sessions three to seven times per month and had not tested positive for drugs since beginning BHS. He believed Parents "put a tremendous amount of effort into their recovery" and changed their behaviors.

Likewise, Angela Nicholson, the director of medical services at BHS, testified Mother began medication-assisted treatment at BHS in January 2019, had not tested positive for drugs since enrolling, and was compliant with treatment. Nicholson saw Mother monthly and believed she was stable. She was not aware of anything that would cause Parents to present a risk to Child and did not have any concerns about their ability to parent.

Due to Parents' compliance with treatment and the placement plan, the family court ordered transitional visitation on July 10, 2019, with the intent of transferring custody of Child to Mother and Father on August 30, 2019. Mother believed the transitional visits went well and Child had begun bonding with her and Father. However, before reunification occurred, Jane Doe (Jane) took Child for a drug test on August 19, 2019; the results, which were returned on August 26, indicated Child was positive for methamphetamine. At the TPR hearing, Mother disputed that result, explaining DSS took Child for another drug screen on August 28, 2019, and that test indicated Child had not been exposed to drugs. Mother denied exposing Child to methamphetamine and did not believe Child was exposed in her home; she asserted she, Father, and Father's grandmother—who lived with them— all tested negative for drugs shortly after Child's positive test. Mother explained she and Father submitted to drug screens at DSS's request on August 26 and November 6, 2019, and the results were negative. She also submitted to hair and

urine drug screens on December 11, one week before the final hearing, but the drug lab would not test the urine sample because the chain of custody form was not properly filled out. Thereafter, Mother stated she and Father paid for instant urine screens the Monday before the final hearing, and the results at the time of trial were negative. She was still awaiting the results from her December 11 hair test. Mother maintained she last used illegal drugs in July 2018, and her last positive drug test occurred in October 2018.

John-Michael Pritchett, a medical assistant at ARCpoint Labs in Greenville, testified he collected Child's hair on August 19, 2019, for a ten-panel "ChildGuard" drug exposure screen. Pritchett confirmed Jane's identity with photo identification but did not have a way to confirm Child's identity. He admitted Jane's aunt, Leslie Simpkins, was the business operations manager at ARCpoint and was working that day; Simpkins informed Pritchett that Jane was bringing Child in and she would not be involved in collecting Child's hair sample. Pritchett testified he sealed Child's hair in an envelope with tamper tape and sent it along with a chain of custody form to the lab for testing. He stated the hair sample did not leave his possession before he mailed it, he did not tamper with it, and Simpkins was not involved in collecting it. Pritchett stated the drug testing lab rejected this sample due to insufficient quantity, which happened frequently with this lab. However, as was his routine practice, Pritchett emailed the lab and asked them to proceed with testing. He stated the sample was positive for methamphetamine.

Simpkins, the business operations manager of ARCpoint Labs in Greenville and Anderson, testified she was Jane's aunt. She stated Jane was concerned because she thought she smelled marijuana on Child after a transitional visit, so Simpkins suggested she bring Child in for a drug test. Simpkins acknowledged ARCpoint also had a lab in Spartanburg, where Jane lived, but Simpkins did not work there. Simpkins testified she told Pritchett that Jane "was coming in with the baby and [Simpkins] could not . . . have any part of it." Simpkins denied being involved with the collection of Child's hair or tampering with the sample. She stated they requested a ChildGuard test, which would detect whether Child had "been in a room where someone" had smoked marijuana, methamphetamine, or another drug. However, Simpkins lacked the expertise to explain how a ChildGuard test worked, the difference between that test and the other tests, or why Child tested positive on this test but negative on a test DSS requested nine days later. She acknowledged the lab results included the comment "Re-accession" under "Sample comment," but she did not know what that meant or recall seeing that on a result before.

Jane stated Child began unsupervised visits with Parents on June 12, 2019, and she did not have any "real concerns" until the overnight visits began on August 8. Jane explained, "There was one time that she returned, I did feel like her clothes had a strong odor, and I couldn't place it, whether it was smoke or marijuana, but that was very concerning." Jane recalled noticing Child "tongue thrusting" when she was weaning from methadone and testified she was told that was common in babies who were born addicted to drugs. She asserted she noticed Child similarly tongue thrusting after an August 19 overnight visit. Jane stated she spoke to Simpkins about her concerns and decided to take Child for a drug screen. She acknowledged ARCpoint had a lab in Spartanburg that was eleven minutes from where she was, whereas the lab in Greenville was twenty-five minutes away. Jane stated Pritchett collected Child's hair sample, and she denied interfering with the collection or tampering with the sample in any way. Jane admitted she did not inform DSS of her concerns that Child had been exposed to drugs or that she had taken Child for a drug test until after she received the results, although she notified DSS about her other frequent concerns. She denied exposing Child to methamphetamine and testified she was surprised Child tested positive. Jane stated everyone in her family submitted to drug tests and the results were all negative. She acknowledged reunification was scheduled to occur four or five days after she received the results from Child's August 19 positive drug screen, and she filed a motion to stop reunification. Jane also acknowledged Simpkins, her aunt, signed an affidavit for that hearing attesting she was the records custodian for ARCpoint in Spartanburg.

Karen Pruitt, the guardian ad litem, testified Parents had "made tremendous progress," "done a remarkable job of beating their addiction," and done everything DSS asked within DSS's timeframe. However, Pruitt was concerned that Parents "had ten years of serious, serious drug use" and recovery was "a life-long event." She was also concerned about Parents' use of Suboxone, which she viewed as "changing one opiate for another." Regarding Child's positive drug screen, Pruitt posited Child could have been exposed to something contaminated, such as fabric, in Parents' home. Pruitt stated Child was tested for drugs again nine days later, and the results were negative. Pruitt testified Parents' home "was immaculate" and "very appropriate." She stated Parents provided material support during visits, including "numerous outfits, toys, food for [Child] to eat while there and food to send back to the" Does, and diapers.

In its final order, the family court found clear and convincing evidence showed (1) Parents' home was unlikely to be made safe within twelve months due to severe or repetitious harm and (2) Parents had diagnosable conditions of drug addiction that

were unlikely to change within a reasonable time.  The court also found TPR was in Child's best interest.  This appeal followed.

On appeal from the family court, this court reviews factual and legal issues de novo.  *Simmons v. Simmons*, 392 S.C. 412, 414, 709 S.E.2d 666, 667 (2011); *Lewis v. Lewis*, 392 S.C. 381, 386, 709 S.E.2d 650, 652 (2011).  Although this court reviews the family court's findings de novo, we are not required to ignore the fact that the family court, which saw and heard the witnesses, was in a better position to evaluate their credibility and assign comparative weight to their testimony.  *Lewis*, 392 S.C. at 385, 709 S.E.2d at 651-52.

The family court may order TPR upon finding a statutory ground for TPR is met and TPR is in the child's best interest.  S.C. Code Ann. § 63-7-2570 (Supp. 2020).  The grounds for TPR must be proved by clear and convincing evidence.  *S.C. Dep't of Soc. Servs. v. Parker*, 336 S.C. 248, 254, 519 S.E.2d 351, 354 (Ct. App. 1999).  A statutory ground for TPR exists when "[t]he child or another child while residing in the parent's domicile has been harmed . . . , and because of the severity or repetition of the abuse or neglect, it is not reasonably likely that the home can be made safe within twelve months."  § 63-7-2570(1).  Another statutory ground for TPR exists when "the parent has a diagnosable condition unlikely to change within a reasonable time including, but not limited to, addiction to alcohol or illegal drugs or prescription medication abuse; and . . . the condition makes the parent unlikely to provide minimally acceptable care of the child."  § 63-7-2570(6)(a).

We find the Does failed to submit clear and convincing evidence to support either statutory ground for TPR.  Admittedly, Mother has a significant history of opioid and drug addiction, and multiple children—including Child—were harmed by Mother's drug use.  *See* § 63-7-2570(1).  Additionally, Nicholson, who was qualified as an expert in addictions counseling, testified Mother had a diagnosable condition of opioid use disorder, which is a lifelong condition.  Further, the Does correctly assert that due to Parents' prior failure to attend and complete drug treatment in prior cases, there is a rebuttable presumption that her diagnosable condition is unlikely to change.  *See* § 63-7-2570(6)(b) ("It is presumed that the parent's condition is unlikely to change within a reasonable time upon proof that the parent has been required by [DSS] or the family court to participate in a treatment program for alcohol or drug addiction, and the parent has failed two or more times to complete the program successfully or has refused at two or more separate meetings with [DSS] to participate in a treatment program.").

However, based on evidence that Mother complied with drug treatment and cooperated with DSS in Child's case, we find clear and convincing evidence does not support either ground. Both of these statutory grounds have prospective application. Section 63-7-2570(1) requires a finding—by clear and convincing evidence—that it was not reasonably likely Mother's home could be made safe within twelve months. Likewise, section 63-7-2570(6)(a) requires a finding—also by clear and convincing evidence—that Mother's diagnosable condition was unlikely to change within a reasonable time. Although Mother's history of opiate and drug addiction was clearly and convincingly established, based on the evidence presented at the time of the TPR hearing, she had maintained sobriety and complied with treatment such that we cannot say by clear and convincing evidence it was not reasonably likely her home could be made safe within twelve months. *See* § 63-7-2570(1). Likewise, we find Mother rebutted the presumption that her diagnosable condition was unlikely to change within a reasonable time. Specifically, Mother began drug treatment with Dr. Gary Sellman at Lighthouse Counseling in April 2018, prior to Child's birth. Dr. Sellman described Mother as "a perfect patient" and stated her "behaviors and life patterns had improved so much . . . that [he] would call her a success." Prior to the family court ordering a placement plan for Child's case in February 2019, Mother transferred from Lighthouse to BHS based on DSS's advice. Based on BHS's January 2019 assessment, Mother did not meet the Association of Addiction Science Medicine's criteria for drug treatment. However, because BHS was prescribing Mother Suboxone, BHS recommended counseling. Mother attended peer-support counseling throughout 2019, and Crouch described her as a success. Crouch testified Mother "was at a really positive place to begin with" and had established a support system through her church. He averred "she had already developed a high level of different coping skills, like refusal skills, the ability to set boundaries, emotional identification, [and] emotional expression" when he began treating her. Likewise, Nicholson averred Mother was stable, she was not aware of anything that would cause Mother to present a risk to Child, and she did not have concerns about Mother's ability to parent.

Critically, Mother's last positive drug test occurred in October 2018—prior to this TPR action being filed and fourteen months before the final day of the TPR hearing. Thereafter, Mother remained compliant in treatment and did not have any positive drug tests. McNeely testified Mother made behavioral changes and completed her placement plan. Pruitt testified Parents had "made tremendous progress in the last year," "done a remarkable job of beating their addiction," and "done everything that DSS ha[d] asked them to do" within DSS's timeframe. Even Jane acknowledged that Mother "seem[ed] like she ha[d] made extreme, wonderful

changes in her life." Based on the foregoing, we find the Does did not present clear and convincing evidence showing it was not reasonably likely Mother's home could be made safe in twelve months. We also find the foregoing rebutted the presumption that Mother's diagnosable condition was unlikely to change within a reasonable time.

The Does primarily rely on Child's positive drug screen from August 19, 2019, to support their grounds for TPR. Although we are very concerned about this positive drug test, based on the circumstances surrounding it, we are not clearly and convincingly persuaded that this test showed Parents exposed Child to drugs or continued to use drugs. Specifically, Jane took Child to the lab where her aunt worked rather than a lab that was closer to her home, the testing facility initially indicated it did not have a sufficient quantity of hair to conduct a test, and the lab result commented the sample had been "Re-access[ed]." Critically, Child tested negative for drugs nine days later in a drug screen requested by DSS, and everyone in both homes tested negative for drugs. We acknowledge Pritchett and Simpkins testified Simpkins was not involved in the collection of this sample and neither of them tampered with the sample. However, based on unanswered questions about how a ChildGuard test works, the fact Child tested negative for drugs nine days later, and the fact Parents tested negative for drugs in September, November, and December 2019, we find this positive drug test does not constitute clear and convincing evidence that Parents exposed Child to methamphetamine or continued to use drugs.

We acknowledge the Does' concern about Mother's use of Suboxone to manage her opiate addiction. While we share this concern, the expert testimony presented at the hearing was Mother's use of Suboxone would not affect her ability to parent Child. Nicholson, who was qualified as an expert in addictions counseling, testified Suboxone does not make a person high, and a person taking Suboxone can work and parent children. She explained Suboxone was FDA-approved for opiate-use disorder and reduced cravings, stopped withdrawals, and reduced the risk of relapse. Nicholson stated Suboxone was a "partial agonist," meaning it "helps cover those receptors in the brain that are . . . there for opiates, but does not give [someone] the same euphoric feeling . . . [or] the same high as an opiate." She averred Suboxone was different than methadone because methadone was "a full agonist," which could make a person high. Nicholson testified Suboxone was approved for long-term use, and people using Suboxone long-term were able to keep jobs and be involved with their families. Critically, although BHS prescribed Parents Suboxone, Nicholson stated she was not aware of anything that would cause Parents to present a risk to Child, and she did not have any concerns about

their ability to parent.  Although Pruitt posited Parents were "changing one opiate for another," the Does did not offer any expert testimony to counter Nicholson's testimony that Suboxone does not make a person high, and a person can work and parent while on Suboxone.  While our standard of review is de novo, we are constrained by the evidence in the record.  Because the only expert testimony presented showed Suboxone would not affect Mother's ability to parent Child, we cannot find by clear and convincing evidence that Mother's ongoing use of Suboxone made her unlikely to provide a safe home for Child, or her diagnosable condition made her unlikely to provide minimally adequate care for Child.

Finally, the Does did not submit sufficient evidence to support their claim that Parents were not adequately treated for methamphetamine or DSS's placement plan was insufficient.  The Does primarily complain that Parents were not seeing a licensed counselor—which they aver means they did not treat their methamphetamine addiction.  However, Nicholson, a licensed addictions counselor, testified she treated Mother.  The Does did not present expert testimony asserting BHS's or Nicholson's treatment was inadequate.  Without expert testimony indicating BHS's treatment was insufficient, this court cannot rely on the Does' assertions to find the treatment was inadequate.

Based on the foregoing, we reverse the termination of Mother's parental rights and remand for a permanency planning hearing pursuant to section 63-7-1700 of the South Carolina Code.  We are mindful Parents have both experienced significant drug abuse issues that have affected Child's life and their own lives.  However, at the time of this trial to terminate their parental rights, they had put together enough of a recovery to avoid failure by a clear and convincing standard.  The learned trial judge was there to judge the credibility of the witnesses and Parents' commitment to a sober lifestyle that puts Child first.  It is our hope that she will revisit the totality of the circumstances that have occurred since the trial in a permanency planning hearing.[3]  A permanency planning hearing will allow all parties and

---

[3] Shortly before oral argument, the Does moved to supplement the record on appeal.  Because this supplemental information was not presented to the family court, the Appellate Court Rules do not permit us to consider it now.  *See* Rule 210(c), SCACR ("The Record shall not, however, include matter which was not presented to the lower court or tribunal."); Rule 210(h), SCACR ("Except as provided by Rule 212 and Rule 208(b)(1)(C) and (2), the appellate court will not consider any fact which does not appear in the Record on Appeal.").  However, at the permanency planning hearing on remand, the family court will have the opportunity to consider this additional evidence as it may impact the consideration

Child's guardian ad litem an opportunity to update the family court on what has occurred since the TPR hearing.  We urge the family court to conduct a hearing as expeditiously as possible, including presentation of a new guardian ad litem report and an updated home evaluation.

**REVERSED AND REMANDED.**

**KONDUROS, GEATHERS, and MCDONALD, JJ., concur.**

---

of whether Parents have overcome their drug addictions such that their home may be made safe for Child.  *See, e.g.*, *DSS v. Cochran*, 356 S.C. 413, 419, 589 S.E.2d 753, 756 (2003) (reversing and remanding TPR due to erroneous admission of mother's blood sample "with leave to open the record to receive any other evidence pertinent to a determination as to whether mother has overcome her drug addiction and to give DSS the opportunity to present a proper chain of custody for mother's blood samples").